JONATHAN D. BLUM, ESQ.
Nevada Bar No. 09515
**WILEY PETERSEN**
10000 W. Charleston Blvd., Suite 230
Las Vegas, Nevada  89135
Telephone No.  (702) 910-3329
Facsimile: (702) 553-3467
jblum@wileypetersenlaw.com

Samuel L. Butt *(admitted pro hac vice)*
sbutt@schlamstone.com
Joshua D. Wurtzel *(admitted pro hac vice)*
jwurtzel@schlamstone.com
**SCHLAM STONE & DOLAN LLP**
26 Broadway
New York, NY  10004
Telephone:  212-344-5400
Facsimile:  212-344-7677

*Attorneys for Plaintiffs John Suprock, Laurie
Suprock, Consortium LLC, and Renewable Energy
Now, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

|  |  |
|---|---|
| JOHN L. SUPROCK, an individual, LAURIE L. SUPROCK, an individual, CONSORTIUM LLC, a South Dakota limited liability company, and RENEWABLE ENERGY NOW, LLC, a Montana limited liability company,<br><br>        Plaintiffs,<br><br>    v.<br><br>QUANTUM ENERGY, INC., a Nevada corporation,<br><br>        Defendant. | CASE NO.:  2:21-CV-02184-JAD-BNW<br><br>**AMENDED JOINT PRETRIAL ORDER** |

Plaintiffs John L. Suprock ("Mr. Suprock"), Laurie L. Suprock ("Mrs. Suprock"), Consortium LLC ("Consortium"), and Renewable Energy Now, LLC ("Renewable Energy" and, collectively, with Mr. Suprock, Mrs. Suprock, and Consortium, the "Suprock Parties" or "Plaintiffs"), and Defendant Quantum Energy, Inc. ("Quantum" or "Defendant") submit this Amended Joint Pre-Trial Order pursuant to Local Rule 16-3, changing the proposed trial dates, only.

//

//

## I.   CONCISE STATEMENT OF THE NATURE OF THE ACTION AND THE PARTIES' CONTENTIONS

(a) **The Suprock Parties contend that:**

1)   they are entitled to a declaratory judgment requiring that the "restricted" legend from their 3,400,000 shares (the "Shares") of Quantum that they acquired should be removed pursuant to Section 4(a)(1) of the Securities Act of 1933, 15 U.S.C. §77(d)(a)(1), ("Section 4(a)(1)"), because Plaintiffs are neither issuers, underwriters, or dealers;

2)   they are entitled to judgment in the amount of $1,802,000, plus interest, for conversion regarding the 3,400,000 Shares because Quantum, in refusing to permit the "restricted" legend to be removed, exercised and unauthorized and wrongful dominion over the Shares, and knowingly and intentionally prevented the Suprock Parties from being able to sell, or otherwise dispose, of the Shares;

3)   they are entitled to judgment on their breach of contract claim in the amount of $303,264, plus interest, based on Quantum's breach in failing to convert the principal and interest amounts of the October 29, 2019 Convertible Promissory Note by which Mr. Suprock loaned Quantum $20,000 into 466,560 shares (the "Note Shares");

4)   in the absence of damages, the Note Shares must be issued to Mr. Suprock and any "restricted" legend should be removed pursuant to Section 4(a)(1);

5)   they are entitled to damages in the amount of $37,200 due to Quantum's improper cancellation of 120,000 Quantum shares owned by Renewable Energy Now, Inc. (the "Renewable Energy Shares").

(b) **Quantum contends that:**

1)   the Suprock Parties have not and cannot show that they provided any valid consideration for the 3,400,000[1] shares that they claim to own;

2)   even if the Suprock Parties could come forward with admissible evidence to establish ownership of the shares in question because of Mr. Suprock's failure to register as a dealer, as

---

[1] A reverse stock split occurred on July 29, 2022.  Nevertheless, for ease of reference and consistency, any discussion regarding the number of shares will be stated as pre-effective numbers

required by 15 U.S.C. § 78o(a)(1), his claimed service agreements and the supposed documents requiring issuance of shares to the Suprock Parties are void pursuant to 15 U.S.C. § 78cc, which section of the Exchange Act makes all transactions made in violation of Section 15 voidable. In other words, not only did the Mr. Suprock act as a dealer making it so that he cannot avail himself of the exemption in Section 4(a)(1), the shares received as part of the distribution to the six (6) investors (2,450,000) and the shares received from the Referral Agreement (850,000) are void.

3) the Suprock Parties are not entitled to have the restricted legend on the shares removed as they never supplied "an opinion of counsel which is satisfactory to [Quantum], to the effect that such registration is not required" as conspicuously stated on the legend of all the shares claimed to be owned by the Suprock Parties.

4) the Suprock Parties are not entitled to have the restricted legend on the shares removed as they have not established that they were not acting as issuers, underwriters, or dealers and the documentary evidence suggests that they were.

5) to the extent the Suprock Parties are able to prove ownership, that they did not receive the shares in void transactions as a dealer, and that the restrictive legend should be removed, the Suprock Parties can point to no evidence to support a claim that Quantum acted with malfeasance as is required for Plaintiffs to be successful in their common law claim for conversion under Nevada law.

6) the Suprock Parties cannot establish that a valid contract exists or that they performed under the alleged contract—indeed Plaintiffs have admitted that they have not performed as specified in the supposed contract they claim to rely upon.

7) the statute of limitations bars Plaintiffs claimed related to the claimed cancellation of shares supposedly owned by Renewable Energy Now, Inc.

8) The Suprock Parties have failed to disclose any admissible measure of damages and have no expert or witness qualified to discuss the supposed value of their claimed shares. As such, even if the Suprock Parties are successful on all of their claims, which they will not be, they are not entitled to any damages but at most a declaration that the restrictive legend be removed.

**II.    STATEMENT OF THE BASIS FOR THIS COURT'S JURISDICTION**

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) since it is between citizens of different states and the amount in controversy is greater than $75,000. This Court has supplemental jurisdiction over the Suprock Parties' state law claims pursuant to 28 U.S.C. § 1367.

**III.    UNCONTESTED FACTS**

The following facts are admitted by the parties and require no proof:

None.

**IV.    CONTESTED ISSUES OF FACT AS AGREED UPON BY THE PARTIES**

The following facts, though not admitted, will not be contested at trial by evidence to the contrary:

None.

**V.    ISSUES OF FACT TO BE TRIED AND DETERMINED AT TRIAL**

The following are the issues of fact to be tried and determined at trial:

**(1) Plaintiffs' Facts**

**A.    Plaintiffs Acquire Their Shares In Quantum**

**1.    Consortium's 400,000 Shares**

1.    On March 31, 2014, Quantum entered into a 6% Series B Convertible Preferred Stock Purchase Agreement, pursuant to which Mr. Suprock purchased and was delivered 200,000 shares of 6% Series B Convertible Preferred Stock.

2.    Mr. Suprock made full payment of $200,000, or $1.00 per share, for these shares at the time of his acquisition.

3.    On or about March 11, 2016, Quantum authorized the issuance of 400,000 shares of Common Stock to Consortium pursuant to the conversion terms of the March 31, 2014 6% Series B Stock Purchase Agreement with Mr. Suprock and the terms of the 6% Series B Convertible Preferred Certificate of Designations (attached as Exhibit A to the March 31, 2014 agreement) with a conversion ratio agreed by Quantum at 1:2 (200,000=400,000) based on a conversion notice received March 2, 2016 from Mr. Suprock, and instructed Quantum's then transfer agent, Pacific Stock Transfer, to issue said shares to Consortium.

4.     On March 11, 2016, said 400,000 shares of Common Stock were issued to Consortium.

**2.  Mr. Suprock's 1,825,000 Shares**

5.     On or about April 11, 2017, Quantum issued and delivered to Mr. Suprock 850,000 shares of Common Stock of Quantum, as compensation under and pursuant to a referral agreement, dated as of March 30, 2017, between Quantum and a company belonging to Mr. Suprock.

6.     These shares were also referred to in the February 28, 2018, Cancellation of Referral Agreement entered into between PCS Advisors, Mr. Suprock, and Quantum, which explicitly stated that the Shares were compensation pursuant to the referral agreement.

7.     On January 16, 2018, Mr. Suprock entered into a Stock Purchase Agreement with Stanley Wilson ("Wilson"), pursuant to which Mr. Suprock purchased and was delivered 325,000 shares of Common Stock of Quantum.

8.     Payment for these shares was made via a $40,000 wire: the $40,000 wire covers additional stock purchases made on January 16, 2018, as set forth below.

9.     Pursuant to an Agreement Concerning the Exchange of Common Stock Between Quantum Energy, Inc. and the Shareholder of FTPM Resources, Inc., dated June 25, 2013, Quantum, among other actions, issued 200,000 shares of Common Stock to Wilson.

10.    On October 13, 2013, Quantum authorized the implementation of a forward stock split of the issued shares of Quantum's Common Stock in a ratio of 150 to 1 for all shares issued as of the record date of November 15, 2013, which resulted in the 200,000 Shares held by Wilson becoming 30,000,000 Shares.

11.    On March 8, 2018, Mr. Suprock entered into a Stock Purchase Agreement with Wilson, pursuant to which Mr. Suprock purchased and was delivered 650,000 shares of Common Stock of Quantum.

12.    Payment for these shares was made via a $30,000 wire, which included the 650,000 shares.

//

//

//

4

### 3. Mrs. Suprock's 325,000 Shares

13.     On January 16, 2018, Mrs. Suprock entered into a Stock Purchase Agreement with Wilson, pursuant to which Mrs. Suprock purchased and was delivered 325,000 shares of Common Stock of Quantum.

14.     Payment for these shares was part of the $40,000 wire transfer discussed above.

### 4. The Suprocks' 850,000 Shares As Joint Tenants

15.     On January 16, 2018, the Suprocks entered into a Stock Purchase Agreement with Wilson, pursuant to which the Suprocks purchased and were delivered, as joint tenants, 850,000 shares of Common Stock of Quantum.

16.     Payment for these shares was part of the $40,000 wire transfer discussed above.

### B. Facts Relevant To Removal Of The "Restricted" Legend

17.     The consideration for the purchase of the Shares was fully provided to Wilson and Quantum, respectively, in excess of two years ago.

18.     Neither Mr. Suprock nor Mrs. Suprock is now, or has ever been, a director or executive officer of Quantum.

19.     Mr. Suprock was on Quantum's Advisory Board in approximately 2014, but left years before any transaction with Mr. Wilson, and did not have any control over Quantum by virtue of such a position.

20.     No partner, member, officer, director, or employee of Consortium or Renewable Energy is now, nor has ever been, a director or executive officer of Quantum.

21.     Prior to January 12, 2022, neither Mr. Suprock nor Mrs. Suprock, nor any partner, member, officer, director, or employee of Consortium or Renewable Energy, or Consortium, has ever been a record or beneficial holder of 10% or more of Quantum's issued and outstanding Common Stock.

22.     None of Mr. Suprock, Mrs. Suprock, Consortium, or Renewable Energy has ever been controlled by or under common control with Quantum and none of them has ever had any contractual rights to exercise any control over Quantum.

//

23.     None of Mr. Suprock, Mrs. Suprock, Consortium, or Renewable Energy has the ability, by relationship, contract or otherwise, to affect the management or policies of Quantum.

24.     None of Mr. Suprock, Mrs. Suprock, Consortium, or Renewable Energy possesses the power, directly or indirectly, to elect or designate any member of Quantum's Board of Directors.

25.     There are no familial relationships and no other business relationships among Mr. Suprock, Mrs. Suprock, Consortium, and Renewable Energy, on the one hand, and Quantum, on the other hand.

26.     There are no other indicia of control with respect to Quantum as exhibited by Mr. Suprock, Mrs. Suprock, Consortium, or Renewable Energy.

27.     Mr. Suprock, Mrs. Suprock, Consortium, and Renewable Energy have been, always, passive investors in Quantum.

28.     None of Mr. Suprock, Mrs. Suprock, Consortium, or Renewable Energy is a dealer.

29.     None of the Suprock Parties ever received any profit for any of the Quantum shares purchased by the Skillings, Ms. Sturgeon, or anyone else.

30.     At the time of each acquisition, each of Mr. Suprock, Mrs. Suprock, Consortium, and Renewable Energy acquired the Shares with investment intent, for retirement, and without a view to a distribution.

31.     In other words, Plaintiffs did not acquire the Shares with a view towards distribution and were not participating in a distribution, which generally means an offering that is not a private offering.

32.     Quantum permitted the removal of the "restricted" legend from shares owned by Katherine Sturgeon, David Skilling, and Caron Skilling, who had purchased their shares from Mr. Wilson contemporaneously with Plaintiffs and payments for which were made through the same wire transfers by which Plaintiffs purchased their shares.

33.     The Skillings and Ms. Sturgeon signed separate Stock Purchase Agreements with Mr. Wilson, made the agreed upon payments, and payment was made in a lump sum at Mr. Wilson's direction.

//

34.     The Skillings and Ms. Sturgeon made the payments of the share purchase price to Mr. Suprock at, as noted, Mr. Wilson's request for a lump sum payment.

35.     The Skillings and Ms. Sturgeon were then able to sell their shares between February 22, 2022 and June 22, 2022, for $165,685.13.

**C.   Plaintiffs' Efforts To Have The Restricted Legend Removed**

36.     On or about November 12, 2021, as resubmitted on November 19, 2021, Mr. Suprock, Mrs. Suprock, and Consortium submitted a request to ClearTrust, LLC ("ClearTrust"), Quantum's then transfer agent, to remove the "restricted" legend on the Shares.

37.     On December 6, 2021, Plaintiffs provided ClearTrust documents demonstrating that proper consideration had been paid for the Shares in response to a question from ClearTrust.

38.     On December 17, 2021, Quantum, through counsel Hamilton & Associates Law Group, P.A., by Brenda Hamilton, sent a letter to ClearTrust, incorrectly claiming that Rule 144 of the Securities Act of 1933 (the "Securities Act") was not available with respect to the Shares and directing ClearTrust not to process the legend removal from the Shares.  (

39.     Quantum became a mandatory reporting company in 2018, when it filed a Registration Statement Under the Securities Act (Form S-1/A).

40.     On December 21, 2021, Quantum filed a Form 15, entitled "Certification and Notice of Termination of Registration under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934" with the SEC.

41.     Quantum made this filing to thwart Plaintiffs' attempt to remove the "restricted" legend.

42.     As of November 12, 2021, Quantum had timely filed with the SEC all reports and other materials required to be filed under Sections 13 or 15(d) of the Exchange Act on the EDGAR system.

43.     On January 7, 2022, Mr. and Mrs. Suprock and Consortium submitted opinion letters, dated January 7, 2022, setting forth that the Shares could be sold under Section 4(a)(1) promulgated under the Securities Act ("Section 4(a)(1)"), and the restricted legend or stop transfer orders on the Shares should be removed.

//

44.     On January 12, 2022, Quantum reported that it had entered into settlement agreements with four former officers and directors and one former affiliate shareholder of Quantum resulting in a reduction in the number of issued and outstanding shares of Common Stock to 31,970,497 (as such number was confirmed on January 13, 2022 by ClearTrust).

45.     Quantum engaged in these purported settlements at least in part so as to be able to claim that the Suprock Parties were control persons and therefore to avoid removal of the "restricted" legend.

46.      None of John Suprock, Laurie Suprock, or Consortium was a party to such settlement agreements.

47.     The retired shares were re-issued following an 8:1 reverse split.

48.     On January 13, 2022, Quantum submitted an attorney opinion letter disagreeing that the Shares could be sold pursuant to Section 4(a)(1) claiming Plaintiffs were underwriters.

49.     Accordingly, on January 17, 2022, the Suprocks and Consortium sent a final opinion letter to ClearTrust explaining why the Shares could be sold.

50.     Ultimately, Quantum refused to permit ClearTrust to remove the restricted legend on Plaintiffs' shares.

51.     Quantum's actions constituted malfeasance.

52.     Accordingly, on February 7, 2022, ClearTrust rejected Plaintiffs' request to remove the "restricted" legend from Plaintiffs' Shares.

53.     Quantum refused to remove the "restricted" legend because it was concerned that Plaintiffs' selling of their shares would drive down Quantum's share price.

**D.  The Note And Quantum's Refusal To Convert To Shares**

54.     On October 29, 2019, Mr. Suprock entered into an 8% Promissory Note with Quantum, in the amount of $20,000 (the "Note"), pursuant to which Quantum promised to repay Mr. Suprock the $20,000 principal loaned by Mr. Suprock 24 months after the date of the Note.

55.     Pursuant to the Note, Quantum was also to pay Mr. Suprock interest at the rate of 8% per annum in shares of restricted Common Stock of Quantum

56.     Mr. Suprock wired $20,000 to Quantum, to the account of Quantum's lawyer, Jerold N. Siegan, pursuant to the Note and the wire instructions provided by Quantum.

57.     The Note contained a Notice of Conversion pursuant to which Mr. Suprock could convert any amount of principal and accrued and unpaid interest into Quantum Common Stock at $0.05 per share.

58.     On October 29, 2021, Mr. Suprock submitted the Notice of Conversion to Craig Kitchen of Quantum, with a copy to Quantum's counsel, pursuant to the terms of the Note.  Under the terms of the note, the $20,000 principal plus $3,328 in interest as of October 29, 2021 should have been converted to 466,560 shares.

59.     On the same day, Mr. Kitchen rejected the conversion without basis.

60.     Quantum has not issued the shares required under the terms of the Note.

61.     Quantum has never paid any principal or interest on the Note

**E.  Renewable Energy's Shares**

62.     Mr. Suprock is the President of Renewable Energy.

63.     On June 10, 2014, Quantum issued 120,000 Quantum shares to Renewable Energy.

64.     These shares were issued as payment for services Renewable Energy rendered under an engagement letter with Quantum dated March 2014.

65.     Quantum cancelled these shares without explanation.

**(2) Defendant's Facts**

1.     Mr. Suprock and/or his wife is a manager or control person of the entities that are plaintiffs in this case and these entities do not actually conduct any business activity.

2.     There are serious questions regarding the validity and authenticity of the documents the Suprock Parties rely upon to substantiate their claim that they provided consideration for the shares they claim to own.  Mr. Suprock did not attempt to find any of the documentation to support his or his companies supposed acquisition of stock and instead attempted to pay another individual to sign an affidavit to corroborate his story; essentially an attempt to bribe an individual into creating "proof" of his and his companies claimed ownership and consideration for the stock at issue in this case.  Similarly, Mr. Suprock did not have a signed version of the note at issue in this case.

3.     Quantum's securities, as relevant here, are a "penny stock" as defined by 17 CFR § 240.3a51-1 whose shares are quoted on the OTC Markets and its securities are thinly traded.

4.      Quantum generated no revenues for the years ending February 28, 2018, February 28, 2019, February 28, 2020 and February 28, 2021 and revenues of only $324,240.00 for the year ending February 28, 2022.

5.      On or about June 20, 2013 Stanley Wilson ("Wilson") took control of Quantum as its Sole Director/President/Secretary/Treasurer.

6.      Wilson would serve as an officer and/or director until his resignation in February 2018.

7.      On or about October 31, 2013, Wilson caused a forward stock split, increasing his ownership of stock from 200,000 to 30,000,000.

8.      On March 21, 2014, Wilson caused the Issuer to designate 2,000,000 Series B Preferred Shares ("Series B") with conversion rights into the Common Stock of between 1:1 and 1:1.25 depending upon the time at which conversion occurred.

9.      Ten days after the Series B designation was created, on March 31, 2014, Mr. Suprock purported to purchase 200,000 of the Series B shares for $200,000 or $1.00 per share.

10.     On such date, Quantum's publicly traded stock price was between 1.20 per share and $1.32 per share. Payment was purportedly made by PCS the same day.

11.     The certificate representing the 200,000 Series B shares conspicuously states "**CONTROL STOCK**", confirming Suprock's status as a control person of the Issuer at such time.

12.     As late as June 26, 2018, Mr. Suprock was able to cause Quantum to make representations in its S-1 filing on its behalf and at that time owned 10.04% of Quantum's outstanding stock.

13.     On March 9, 2016, Wilson and executed a written consent of Quantum's board, converting the Series B Shares into 400,000 shares which Mr. Suprock caused to be issued to Consortium at a conversion ratio of 2 shares of Common Stock for each share of Series B, despite that the Series B designation filed with the Nevada Secretary of State required a conversion ratio of 1.15 shares of Common Stock for each share of the Series B on such date.

14.     Jeffrey Mallmes, the prior Chairman and President of Quantum, has stated by declaration that the $200,000 paid by Mr. Suprock was collected from other investors.

//

10

15.    On March 24, 2014 Quantum and Renewable Energy Now purported to enter into an agreement in which Renewable Energy Now would purportedly provide consulting services to Quantum in exchange for 120,000 shares.

16.    On August 14, 2014 Quantum announced that Mr. Suprock was appointed to Quantum's Advisory Board.

17.    On March 30, 2017 Quantum entered into a Referral Agreement with PCS to act as a "finder" in exchange for 850,000 shares.

18.    The Suprock Parties signed agreements to locate acquisitions for the Company both before and after the public was provided with information about such transactions.

19.    Ten months later, on February 5, 2018, Mr. Suprock and Jeffrey Mallmes, who at the time was Chairman and President of Quantum, terminated that agreement.

20.    In a declaration by Mallmes on November 22, 2021, Mallmes stated that the Referral Agreement was done to conceal Mr. Suprock's actions as an unregistered broker-dealer.

21.    This is similarly confirmed by Andrew Kacic, a prior Chief Executive Officer of Quantum, who in a declaration dated January 31, 2022 stated the sole purpose of the Referral Agreement was for Mr. Suprock to act as a broker-dealer.

22.    Mr. Suprock himself testified that he and his companies acted as unlicensed brokers to find investors for Quantum.

23.    Mr. Suprock wanted the then CEO/Chairman/Secretary of Quantum to be removed from his role which ultimately occurred and was confirmed to Mr. Suprock in writing.

24.    Between January 22, 2018 and March 15, 2018, Mr. Suprock purports to have purchased an aggregate of 3,500,000 shares from Wilson, for which he claims to have made payments totaling $70,000.00 or $0.02 per share. Mr. Suprock either sold or disposed of an aggregate of 1,350,000 of these heavily discounted shares to 6 investors who sold such shares publicly.

25.    On January 22, 2018, Mr. Suprock claims to have delivered the aggregate sum of $40,000 to Wilson for the supposed purchase of an aggregate of 2 million shares of stock at $0.02 per share, a significant discount of approximately 80% from Quantum's trading price of $.104 that day.

//

26. Despite supposedly delivering payment for the 2 million shares, the Suprock Parties only received 1,500,000 shares and the remaining 500,000 shares were issued to Caron Skilling and David Skilling.

27. On March 15, 2018, Mr. Suprock claims to have delivered the sum of $30,000 to Wilson for the purchase of an aggregate of 1,500,000 shares at a price of $0.02 per share, a significant discount of approximately 81% from Quantum's trading price of $.1056 that day.

28. Despite supposedly purchasing 1,500,000 shares, the Suprock Parties only received 650,000 shares and the remaining 850,000 shares were issued to Katherine Sturgeon, Steven J. Hammer, Gordon E. Erickson, and Robert D. Stubbins.

29. While the above facts reflect at least six investors, there may be more as indicated in the Mallmes declaration. Indeed, Mr. Suprock has admitted to his unregistered broker dealer activities in writing, stating by email dated August 27, 2021 that "some investors [he] brought into QEGY" are interested in participating in a buyback program that had been recently announced.

30. It appears that this email must be in reference to persons other than the six investors known and discussed above, as these investors appear to have sold their shares.

31. Each certificate issued to the Suprock Parties' had a conspicuous legend stating as follows:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT ND NOT FOR A VIEW TOWARD RESALE AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, *UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL WHICH IS SATISFACTORY TO THE COMPANY, TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED*.

32. The Suprock Parties contended that Section 4(a)(1) exempted their claimed shares from registration. On or about February 7, 2022, the transfer agent, ClearTrust notified the Suprock Parties that it would not remove the restrictive legend from their shares in reliance upon Section 4(a)(1).

//

//

33.     Because Quantum has had less than 300 record holders on the first day of each year after the year the registration statement was declared effective, Quantum's reporting obligations were suspended by operation of law.  Section 15(d).

34.     Quantum paused its reporting to attempt to obtain the missing information, audit the information it was putting out, and to ensure that any reports Quantum did make were accurate.

35.     Many persons in the prior management of Quantum, beyond the Suprock Parties obtained stock in dealings that lacked information, paper trails, and appeared to be potentially violative of securities regulations.

36.     As such, and in an effort by new management to clean up Quantum, the new management offered all prior insiders a standard settlement that included the retirement of their shares.

37.     Not insignificantly, this same offer was made to the Suprock Parties who declined it.

38.     The supposed note appears to have been entered on or about October 29, 2019.

39.     The claimed note limits the use of the proceeds to fund operations of Quantum and its subsidiary FTPM Resources Inc., specifically to fund a transaction for the development and marketing of the "Glucose Vertical."

40.     The Suprock Parties claim they funded the note by a payment to Jerold N. Siegan, not Quantum, a week earlier.

41.     Mr. Suprock has testified that he could not even find a signed version of the note at issue in this case, again raising serious concerns and doubts as to any of the supposed "evidence" he might purport to come forward with.

42.     The alleged Note itself does not contain any clause or agreement related to the conversion of the debt to stock.

43.     The Notice of Conversion the Suprock Parties claim to rely upon references an entirely different document, a "Conversion Option dated October 29, 2019" that has never been produced.

44.     Mr. Suprock was informed that in order to effectuate a conversion additional documentation would be need that was never provided.

//

//

45.     The Suprock Parties received 970,000 of their purported shares for claimed services at values/prices materially discounted from the then trading prices and 2,150,000 shares from Quantum's then control person, Wilson, also at prices materially discounted from the then trading prices.

46.     The Suprock Parties acted in the capacity of unregistered broker-dealers unlawfully raising funds from investors through the sale of Quantum's securities.

47.     Rule 144 is unavailable under the following circumstances that are applicable to Quantum: (i) shell companies (Quantum operated as a shell company from at least February 2010 until at least February 2011); (ii) non-mandatory filers; (iii) Quantum had not filed Form 10 information for the prior 12 months, nor is it required to do so.

48.     The SEC and FINRA confirm that Mr. Suprock has never been registered as a broker or a dealer as is required by Section 3(a)(4)(A) and 3(a)(5)(A) of the Securities Act of 1934.

49.     The disparity between the price at which the Suprock Parties purchased shares and the price at which those shares were publicly traded establish a presumption that he controlled Quantum and thus was an underwriter.

50.     The Suprock Parties' disposal of at least 1,350,000 shares and the prior registration of 2,575,000 shares for public sale make clear that the Suprock Parties had the intent to distribute/resell the shares.

51.     The "issuer" includes Wilson, a person directly or indirectly controlling Quantum at the time.

52.     Between June 2014 and March 2018 Mr. Suprock received an aggregate of (i) 970,000 shares for services he rendered individually or through his corporate egos; (ii) purchased Series B shares and converted them to 400,000 shares (more than allowed by the conversion table); (iii) the Suprock Parties purchased 3,500,000 shares from Wilson, Quantum's control person, at deeply discounted prices, and almost immediately thereafter distributed at least 1,350,000 shares to six (6) investors all of which have since been distributed by those persons.

53.     The Suprock Parties have had control of more than 10% of Quantum's shares from time to time, including as early as March 2018 and as recently as at least February 2022, when they controlled as much as 14.77% of Quantum's stock.

54.     The Suprock Parties shares represent 30% of Quantum's public float as of September 29, 2022, which represents more than 65,000% of the average daily trading volume of stock as of September 29, 2022.  The average daily trading volume was 34.63 shares for an average daily market value for the 30 days preceding September 29, 2022 was only $456.56.

55.     Even the resale of more than 50 shares (and/or repeated resales) would cause a precipitous and material decline in Quantum's share price putting the Suprock Parties in a position to exercise control and influence over Quantum.

56.     The Legal Opinions dated November 19, 2021, January 7, 2022, and January 24, 2022 fail to state or explain the exemption from SEC registration relied upon by the Suprock Parties for their original acquisition of the shares and the same legal opinions fail to address the fact that each certificate evidencing shares imposes the condition that the Suprock Parties provide a legal opinion acceptable to Quantum.

57.     The circumstances of the Suprock Parties' receipt of shares, the true consideration paid, and the exemption from SEC registration relied upon for the original issuance of shares are factual matters necessary for the analysis of whether an exemption from SEC registration is available for the resale of such shares.  None of this information is included in the Suprock Parties' Legal Opinions.

58.     Mr. Suprock, individually and through various entities he controlled, engaged in the business of purchasing and selling securities.

59.     As a result of Mr. Suprock's failure to register as a dealer, as required by 15 U.S.C. § 78o(a)(1), his service agreements and the documents requiring issuance of shares to the Suprock Parties are void pursuant to 15 U.S.C. § 78cc.

60.     When the Suprock Parties relied on a supposed reporting requirement on or about November 19, 2021 in order to attempt to utilize Rule 144 as an exemption to registration, Quantum did not have a reporting requirement as a matter of law.

61.     Quantum stopped voluntarily reporting not to thwart the Suprock Parties (which they could not in any event because regardless Quantum was not a mandatory reporter) but because the historical information regarding the company, including years of missing information, and financial discrepancies and questions regarding dealings and stock transfers required Quantum to pause its

reporting to attempt to obtain the missing information, audit the information it was putting out, and to ensure that any reports Quantum did make were accurate.

62.     At an absolute minimum, Quantum has valid concerns regarding the Suprock Parties' qualifications to rely upon exemptions from registration.  Quantum has a duty to its other shareholders and itself to avoid the liability that would attach to Quantum if it blindly signed off on removal of the restrictive legend with these valid and glaring concerns outstanding.

63.     The Suprock Parties have made no attempt to show that they could have sold their stock had the restrictive legend been removed or what such sales would do to Quantum's share price.

64.     The market would not have supported the sale of all of the Suprock Parties stock.  The average daily trading volume was 34.63 shares for an average daily market value for the 30 days preceding September 29, 2022 of only $456.56.

65.     Even the resale of more than 50 shares (and/or repeated resales) would cause a precipitous and material decline in Quantum's share price putting the Suprock Parties in a position to exercise control and influence over Quantum.  Not to mention what would occur if the Suprock Parties attempted to sell all 3,400,000 shares on a single day (the share price would go to $0.00).

66.     If the Suprock Parties' sales made up the entire daily trading volume, it would have taken them approximately 406 years to sell all 3,400,000 shares.

67.     The Suprock Parties have not established their damages, nor can they as they have entirely failed to disclose anything to support their calculation or retain an expert to opine on the actual worth of 3,400,000 shares on a single day.

68.     The Suprock Parties admit that the shares at issue were cancelled no later than November 28, 2018.

69.     The Suprock Parties filed their claims, later consolidated into this case, on March 18, 2022 (Doc. 1 Nevada Dist. Ct. Case No. 2:22-cv-00494-JAD-BNW).

70.     The publicly filed S-1 of November 28, 2018 included the information related to the cancellation of shares.

//

//

71.     The Suprock Parties have failed to come forward with the "Conversion Option dated October 29, 2019" that would be required to substantiate any claim to a right to convert the debt to stock as the Note itself does not contain any such provision.

72.     Quantum has valid concerns regarding the Suprock Parties' qualifications to rely upon exemptions from registration.  Quantum has a duty to its other shareholders and itself to avoid the liability that would attach to Quantum if it blindly signed off on removal of the restrictive legend with these valid and glaring concerns outstanding.  Moreover, none of the supposed acts the Suprock Parties point to were done to stop the Suprock Parties from relying on any exemptions.  Nothing about Quantum's actions have been wrongful or constitute malfeasance.

## VI.     CONTESTED ISSUES OF LAW AS AGREED UPON BY THE PARTIES

The following are the issues of law to be tried and determined at trial:

1) Did the Suprock Parties provide proper consideration for the shares they claim to own?

2) Did the Suprock Parties obtain their claimed shares as unregistered broker-dealers voiding the shares they claim to own?

3) Did the Suprock Parties comply with the requirements necessary to have the "restricted" legend removed?

4) Should the "restricted" legend have been removed from the Shares under Section 4(a)(1)?

5) Were or are the Suprock Parties issuers, underwriters, or dealers as those terms are used in Section 4(a)(1)?

6) Did Quantum act with malfeasance, if malfeasance is required, by not removing the "restricted" legend?

7) Did Quantum convert Plaintiffs' Shares and the Renewable Energy Shares?

8) Is the Note valid and binding?

9) Did the Suprock Parties fully perform under the Note?

10) Did Quantum breach the Note by not issuing the Note Shares?

11) Are the Suprock Parties' claims related to cancellation of shares of Renewable Energy barred by the statute of limitations?

12) The Suprock Parties' damages for each of their claims.

## VII.  LISTS OF EXHIBITS THAT WILL BE OFFERED INTO EVIDENCE BY THE PARTIES AT TRIAL

### (A) Exhibits Agreed Upon

The following exhibits are stipulated into evidence in this case and may be so marked by the clerk:

| EXHIBIT | DESCRIPTION | BATES RANGE (from Plaintiffs' Appendices to Summary Judgment Motion unless otherwise noted) |
|---|---|---|
| P2 | Quantum Energy Inc. - John L. Suprock Certificate Number 3293 | PLTF0016-17 |
| P7 | Quantum Energy Inc., - John Suprock Certificate Number 3307 | PLTF0031-32 |
| P9 | Quantum Energy, Inc. John Suprock & Laurie Suprock Certificate Number 3305 | PLTF0038-39 |
| P11 | October 31, 2013 - Unanimous Written Consent of Directors - Board of Directors Quantum Energy, Inc. | PLTF0053 |
| P14 | Quantum Energy, Inc. John Suprock Certificate Number 3314 | PLTF0062-63 |
| P16 | Quantum Energy, Inc. John L. Suprock Preferred Stock Certificate | PLTF00080 |
| P20 | March 11, 2016 - Quantum Energy Inc. Consortium LLC Certificate Number 3262 | PLTF0090-91 |
| P32 | October 29, 2021 – Email Correspondence with Gustave Passante | PLTF0164-65 |
| P35 | December 7, 2021 – Email Correspondence with William Westbrook | PLTF0171-81 |
| P36 | June 10, 2014 - QEGY Renewable Energy Now LLC 120,000 shares Certificate 3246 | PLTF0183-84 |
| P39 | Quantum Energy Certificate 3306 dated January 27, 2018 Quantum Energy Certificate 3306 dated January 27, 2018 | PLTF0204-05 |
| P44 | December 17, 2021 – Letter to ClearTrust | PLTF0242-43 |
| P45 | Form S-1/A filed with U.S. Securities and Exchange Commission | PLTF0245-341 |
| P46 | December 21, 2021 – Form 15 | PLTF0343 |
| P49 | January 13, 2022 – Letter from Quantum | PLTF0368-71 |
| P51 | Email Correspondence between Counsel and ClearTrust | PLTF0395-97 |

| P57 | Email Correspondence re Stock Purchase dated August 27, 2023 | PLTF0871-72 |
|---|---|---|
| D2 | Quantum Energy, Inc. Form 10-K for the period ending 2/28/19 | APP-66 - APP-122 |
| D3 | Quantum Energy, Inc. Form 10-K for the period ending 2/29/20 | APP-123 - APP-172 |
| D4 | Quantum Energy, Inc. Form 10-K for the period ending 2/28/21 | APP-173 - APP-216 |
| D5 | Quantum Energy, Inc. Form 10-K for the period ending 2/29/22 | APP-217 - APP-260 |
| D6 | Quantum Energy, Inc. Company Information and Updated Disclosure Statement for the Quarter Ending August 31, 2014 | APP-261 - APP-282 |
| D7 | Quantum Energy, Inc. Form 10-Q for the period ending 11/30/18 | APP-283 - APP-325 |
| D8 | Unanimous Written Consent of Board of Directors of Quantum Energy, Inc. dated October 31, 2013 | APP-326 - APP-327 |
| D9 | Certificate of Designation of 6% Series B Convertible Preferred Stock executed March 31, 2014 | APP-328 - APP-333 |
| D10 | Quantum Energy Inc. Business Checking Account Statement for March 13, 2014 to March 31, 2014 | APP-343 - APP-347 |
| D11 | Quantum Energy Inc. Form S-1/A (Securities Registration Statement) filed 11/28/2018 | APP-350 - APP-569 |
| D12 | Quantum Energy, Inc. Form 10-K for the period ending 2/29/20 | APP-570 - APP-619 |
| D17 | Security Balances - Detail as of 8/25/2021 | APP-654–APP-666 |
| D19 | Certificate No. 3308 issued to Caron Skilling for 250,000 Shares of Quantum Energy, Inc. Common Stock | APP-676–APP-677 |
| D20 | Certificate No. 3309 issued to David Skilling for 250,000 Shares of Quantum Energy, Inc. Common Stock | APP-678–APP-679 |
| D21 | Termination Report effective 8/25/2021 | APP-685–APP-722 |
| D22 | John Suprock Email dated August 27, 2021 | APP-723–APP-724 |
| D23 | Letter from Keith B. Stein to Quantum Energy, Inc. dated November 15, 2021 re: David C. Skilling and Caron M. Skilling | APP-725–APP-730 |
| D24 | Letter from Keith B. Stein to Quantum Energy, Inc. dated November 15, 2021 re: Katherine Sturgeon | APP-731–APP-736 |

| D25 | Letter from David C. and Caron M. Skilling to Quantum Energy, Inc. dated November 12, 2021 | APP-737–APP-740 |
| D26 | Letter from Katherine Sturgeon to Quantum Energy, Inc. dated November 15, 2021 | APP-741–APP-744 |
| D27 | Registrar Control for the period from 8/26/21 to 9/26/22 | APP-745–APP-753 |
| D33 | Email from Gustave Passanante to John Suprock dated October 29, 2021 re: Suprock Note Notice of Conversion | APP-805–APP-807 |
| D45 | Email from John Suprock to Stan Wilson dated January 27, 2022 | APP-55 |
| D46 | Email from John Suprock to Dennis Danzik dated August 28, 2021 | APP-56 |
| D49 | Email exchange John Suprock and Craig Kitchen dated October 26, 2021 | P00000758 - 759 |
| D50 | Email exchange John Suprock and Craig Kitchen dated October 28, 2021 | P00000773 - 774 |

Plaintiffs and Defendant reserve the right to use any exhibits listed by any other party and, for purposes of impeachment, exhibits not herein listed.

**(B) Exhibits To Which Objection Is Made**

As to the following exhibits, the party against whom the same will be offered objects to their admission on the grounds stated:

| EXHIBIT | DESCRIPTION | OBJECTION |
| --- | --- | --- |
| P3 | Unanimous Written Consent of Directors - Quantum Energy Inc. | 901, 1002 |
| P4 | Cancellation of Referral Agreement | 901, 1002 |
| P5 | Stock Purchase Agreement | 901, 1002 |
| P6 | January 22, 2018 - Stanley F. Wilson $40,000.00 | 401, 901 |
| P8 | Stock Purchase Agreement - John and Laurie Suprock | 901, 1002 |
| P10 | June 25, 2013 - Agreement Concerning the Exchange of Common Stock Between Quantum Energy, Inc. & The Shareholder of FTPM Resources, Inc. | 401, 403, 901, 1002 |
| P12 | March 8, 2018 - Stock Purchase Agreement | 901, 1002 |
| P13 | March 15, 2018 - Stanley F. Wilson $30,000.00 | 401, 901 |
| P15 | March 31, 2014 - Quantum Energy, Inc. 6% Series B Convertible Preferred Stock Purchase Agreement | 901, 1002 |
| P17 | Quantum Energy, Inc. Comerica Basic Business Check Statement | 401, 602, 901, 1002 |

| P18 | John L. Suprock Wire Transfer to Quantum - March 31, 2014 | 401, 901 |
|---|---|---|
| P19 | March 9, 2016 - Unanimous Written Consent of Directors - Board of Directors Quantum Energy, Inc. | 901, 1002 |
| P21 | Letter of Instructions & Rule 144 Seller's Representation Letter | 602, 704, 802 |
| P22 | Letter of Instructions & Rule 144 Seller's Representation - Quantum Energy Inc. | 602, 704, 802 |
| P23 | January 7, 2022 – Letter stating Shares could be sold under Section 4(a)(1) | 602, 704, 802 |
| P24 | January 17, 2022 – Letter response to Quantum's letter dated January 13, 2022 | 602, 704, 802 |
| P25 | October 30, 2021 – E-mail Correspondence from Quantum | 106, 401, 403, 408 |
| P26 | November 2, 2021 – E-mail Correspondence from Quantum | 106, 408 |
| P27 | October 29, 2019 – Promissory Note | 901, 1002 |
| P28 | Statement of Transfer of Funds $20,000.00 | 401, 901 |
| P29 | Wiring Instructions | 401, 901 |
| P30 | October 29, 2021 – Notice of Conversion | 401, 901 |
| P31 | October 29, 2021 – Email Correspondence with Craig Kitchen | 408, 802 |
| P33 | October 29, 2021 – Email Correspondence with Eric Benzenberg | 802 |
| P34 | December 6, 2021 – Email Correspondence to ClearTrust | 802 |
| P37 | Quantum Energy Engagement Letter | 602, 901, 1002 |
| P38 | January 16, 2022 – Stock Purchase Agreement | 901, 1002 |
| P40 | Letter of Instructions & Rule 144 | 602, 704, 802 |
| P41 | Letter of Instructions & Rule 144 | 602, 704, 802 |
| P42 | January 7, 2022 – Letter to Quantum Energy Inc. | 602, 704, 802 |
| P43 | December 6, 2021 – Email Correspondence | 802 |
| P47 | January 7, 2022 – Opinion Letter from Plaintiffs | 602, 704, 802 |
| P48 | January 12, 2022 – Filing of Common Stock | 106, 401, 403, 602 |
| P50 | January 17, 2022 – Opinion Letter from Plaintiffs | 602, 704, 802 |
| P52 | April 11, 2022 – Termination letter of ClearTrust | 401, 403 |
| P53 | Yahoo Finance historical for Quantum share price as trial date | 602, 701, 704, 802, 901, 1002 |
| P54 | January 16, 2018 Stock Purchase Agreement between Stanley F. Wilson and David C. Skilling. | 401, 403, 602, 901, 1002 |
| P55 | January 16, 2018 Stock Purchase Agreement between Mr. Wilson and Caron M. Skilling. | 401, 403, 602, 901, 1002 |

| P56 | March 8, 2018 Stock Purchase Agreement between Mr. Wilson and Katherine Sturgeon. | 401, 403, 602, 901, 1002 |
|---|---|---|
| P58 | January 2018 Bank Statement | 401, 403, 901, 1002 |
| P59 | March 2018 Bank Statement | 401, 403, 901, 1002 |
| P60 | Opinion Letter dated January 13, 2022 re: Sturgeon | 401, 403, 602, 704, 802 |
| P61 | Opinion Letter dated January 13, 2022 re: Skillings | 401, 403, 602, 704, 802 |
| D1 | Historical Data re: Quantum Energy Stock | 401, 701, 901, 1002 |
| D13 | Declaration of Jeffery Mallmes dated November 22, 2021 | 601, 602, 704, 802, 901, 1002 |
| D14 | Jeff Mallmes Email sent 6/13/2022 to John Suprock re: Shares | 401 |
| D15 | August 14, 2014 GlobeNewswire Article titled "Quantum Energy Announces Five Member Advisory Board" | 401 |
| D16 | Declaration of Andrew Kacic dated January 31, 2022 | 601, 602, 704, 802, 901, 1002 |
| D18 | Samuel L. Butt Email dated December 6, 2021 | 401 |
| D28 | Letter from Brenda Hamilton to Clear Trust, LLC dated January 13, 2022 re: John Suprock and Consortium LLC - Section 4(a)(1) Opinion Letter | 704, 802 |
| D29 | Letter from Brenda Hamilton to Clear Trust, LLC dated January 24, 2022 re: John Suprock and Consortium LLC - Section 4(a)(1) Opinion Letter | 704, 802 |
| D30 | Email chain to/from Samuel L. Butt dated January 24 - February 7, 2022 re: Legal Opinion re: Suprock / QEGY | 401 |
| D31 | Letter from Brenda Hamilton to ClearTrust, LLC dated December 17, 2021 | 704, 802 |
| D32 | Declaration of Craig Kitchen, William Westbrook, and William Hinz | 601, 602, 704, 802 |
| D34 | Stan Wilson/John Suprock email dated October 7, 2021 | 401, 403, 701, 704 |
| D35 | John Suprock Email to Jeff Mallmes dated December 2, 2021 | 401 |
| D36 | John Suprock Email to Jeff Mallmes dated November 5, 2021 | 401 |
| D37 | John Suprock Email Exchange with Jeff Mallmes dated December 2, 2021 | 401 |
| D38 | John Suprock Email to Stan Wilson dated November 30, 2021 | 401 |
| D39 | Stan Wilson Email to John Suprock "Advisory Board Update" dated November 25, 2014 | 401 |

| D40 | John Suprock Email to Stan Wilson dated August 26, 2014 | 401 |
| D41 | Jeff Mallmes Email to John Suprock dated March 8, 2022 | 401 |
| D42 | John Suprock Email to Quantum dated June 2, 2021 | 401 |
| D43 | Email from John Suprock to Quantum dated August 27, 2021 | 401 |
| D44 | Email exchange Stan Wilson and John Suprock dated March 30, 2017 | 401 |
| D47 | Email from John Suprock to Jeff Mallmes dated December 7, 2021 | 401 |
| D48 | Email from John Suprock to Jeff Mallmes dated September 22, 2021 | 401 |
| D51 | Email from John Suprock to Jeff Mallmes dated October 27, 2021 | 401 |
| D52 | Email from John Suprock to Stan Wilson dated October 29, 2021 | 401 |
| D53 | Email exchange John Suprock and Jeff Mallmes dated June 13, 2022 | 401 |
| D54 | Email from Kathy Sturgeon dated January 12, 2022 | 401 |
| D55 | Email from Kathy Sturgeon dated January 12, 2022 | 401 |

**(A) <u>Parties' Intent To Present Evidence In Electronic Format</u>**

Plaintiffs and Defendant intend to present evidence in electronic format to jurors for purpose of jury deliberations.  The parties will consult the court's website and the assigned judge's courtroom administrator for instructions on how to prepare evidence in electronic format and other requirements.

**(B) <u>Depositions</u>**

**(1) <u>Plaintiffs' Designations</u>**

Plaintiffs will offer the following depositions against Defendant:

| Witness | Page:Line | Defendant's Objections |
| --- | --- | --- |
| **William Hinz** | 20:5-21:9, | **403** |
| **William Hinz** | 22:8-24:10 | **401, 403** |
| **William Hinz** | 26:12-31:22 | **401, 403, 602** |
| **Craig Kitchen** | 15:21-18:18 | **106 (18:19 - 19:15), 401, 403, 602** |
| **William Westbrook** | 18:4-15; 22:9-27:8 | **401, 403, 602** |
| **William Westbrook** | 37:22-38:7 | **106 (38:7 – 18), 602** |

Plaintiffs reserve all rights to use all deposition transcripts taken in this action pursuant to Fed. R. Civ. P. 32.

### (2) Defendant's Designations

Defendant will offer the following deposition against Plaintiffs:

| Witness | Page:Line | Plaintiffs' Objections |
|---|---|---|
| John Suprock | 10:19 – 25 | 401, 602 |
| John Suprock | 11:8 – 9 | 401, 602 |
| John Suprock | 13:6 – 15 | 401 |
| John Suprock | 13:22 – 25 | 401 |
| John Suprock | 15:16 – 16:5 | 401, 602 |
| John Suprock | 17:13 – 17 | |
| John Suprock | 33:12 – 49:21 | 401, 403, 602 |
| John Suprock | 56:3 – 61:25 | 401, 403, 602 |
| John Suprock | 62:6 - 10 | 401, 403, 704 |
| John Suprock | 69:22 - 25 | 401, 403 |
| John Suprock | 71:13 - 24 | 401, 403 |
| John Suprock | 83:15 – 85:7 | 401, 403 |

Defendant reserves all rights to use all deposition transcripts taken in this action pursuant to Fed. R. Civ. P. 32.

### (C) Objections to Depositions

The Parties' objections to the depositions are as set forth above.

## VIII.   WITNESS LIST

The following witnesses may be called by the parties at trial:

### (a) Plaintiffs' Witnesses

| Witness | Address |
|---|---|
| John Suprock | c/o Plaintiffs' counsel |
| Laurie Suprock | c/o Plaintiffs' counsel |
| Katherine Sturgeon | 2305 Wyoming Street, Missoula, MT 59801 |

| Witness | Address |
|---|---|
| David Skilling | 6620 Gharrett Street, Missoula, MT 59803 |
| Caron Skilling | 6620 Gharrett Street, Missoula, MT 59803 |
| Stuart Jeffery | GEL Group, LLC, 21 Penn Plaza, New York, NY 10001 |
| Jeffrey Mallmes | |
| William Hinz | c/o Defendant's counsel |
| Craig Kitchen | c/o Defendant's counsel |
| William Westbrook | c/o Defendant's counsel |

### (b) Defendant's Witnesses

| Witness | Address |
|---|---|
| John Suprock | c/o Plaintiffs' counsel |
| Laurie Suprock | c/o Plaintiffs' counsel |
| Jeffrey Mallmes | |
| Raleigh Kone | |
| Andrew Kacic | |
| Katherine Sturgeon | |
| David Skilling | 6620 Gharrett Street, Missoula, MT 59803 |
| Caron Skilling | 6620 Gharrett Street, Missoula, MT 59803 |
| Steven J. Hammer | |
| William Hinz | c/o Defendant's counsel |
| Craig Kitchen | c/o Defendant's counsel |
| William Westbrook | c/o Defendant's counsel |
| Samuel Butt | c/o Plaintiffs' counsel |

## IX.   MOTIONS IN LIMINE

No motions in limine have been filed to date.  The parties will file any motions in limine at least 30 days before trial in accordance with LR 16-3(a).

//

X.   **PROPOSED TRIAL DATES**

The attorneys or parties have met and jointly offer these three trial dates: October 8, 2024, October 15, 2024, or December 9, 2024. It is expressly understood by the undersigned that the court will set the trial of this matter on one of the agreed-upon dates if possible; if not, the trial will be set at the convenience of the court's calendar.

XI.   **ESTIMATED TRIAL LENGTH**

It is estimated that the trial will take a total of 8 days.

**APPROVED AS TO FORM AND CONTENT:**

Dated this 13th day of May, 2024.
**FENNEMORE CRAIG, P.C.**

By:    */s/ Christopher H. Byrd*
Christopher H. Byrd
Chelsie A. Adams
9275 W. Russel Road, Suite 240
Las Vegas, Nevada 89148
Telephone: (702) 692-8000
Facsimile: (702) 692-8099
Email: cbyrd@fennemorelaw.com
Email: cadams@fennemorelaw.com

    and-

**FENNEMORE CRAIG, P.C.**

By:    */s/ David A. Timchak*
David A. Timchak (admitted *pro hac vice*)
2394 E. Camelback Road, Suite 600
Telephone: (602) 916-5000
Facsimile: (602) 916-5999
Email: dtimchak@fennemorelaw.com

*Attorneys for Defendant Quantum Energy, Inc.*

Dated this 13th day of May, 2024.
**WILEY PETERSEN**

Jonathan D. Blum, Esq.
Nevada Bar. No. 9515
10000 W. Charleston Blvd., Suite 230
Telephone No. (702) 910-3329
Facsimile: (702) 553-3467
E-Mail: jblum@wileypetersenlaw.com

and-

**SCHLAM STONE & DOLAN LLP**

*/s/ Samuel L. Butt*

Samuel L. Butt (admitted *pro hac vice*)
Joshua D. Wurtzel (admitted *pro hac vice*)
26 Broadway
New York, New York 10004
Tel: (212) 344-5400
E-Mail: sbutt@schlamstone.com
E-Mail: jwurtzel@schlamstone.com

*Attorneys for Plaintiffs John Suprock, Laurie Suprock, Consortium LLC, and Renewable Energy Now, LLC*

# XII. <u>ACTION BY THE COURT</u>

**IT IS HEREBY ORDERED THAT:**

1. **<u>Trial date</u>**.  This case is set down for a JURY trial on the Tuesday, December 3, 2024 at 9:00 a.m. two-week trial stack.

2. **<u>Calendar call</u>**.  The parties must appear for Calendar Call on November 18, 2024, at 1:30 p.m.

3. **<u>Trial documents must be filed by Calendar Call</u>**.  No later than noon on the day before the scheduled Calendar Call, each party must file with the Court: (a) the parties' trial briefs; (b) a list of each party's witnesses; (c) a stipulated exhibit list, and separate exhibit lists for exhibits that are not stipulated (the parties must meaningfully meet and confer to prepare a stipulated exhibit list before this deadline); (d) jointly proposed jury instructions and separate jury instructions for proposed instructions that are not stipulated to; (e) each party's proposed voir dire questions.

4. **<u>Deposition designations due 30 days before trial</u>**.  Any party who anticipates presenting deposition testimony in lieu of live testimony must file (a) page-and-line designations along with (b) a mini version of each relevant deposition transcript at least 30 days before trial; failure to timely file deposition designations will result in the preclusion of the testimony at trial.  **Objections** to such designations must be filed no later than **five calendar days after** the designations are filed; failure to file timely objections to deposition designations renders those objections waived.  **Responses to any such objections are due three calendar days after** the objections are filed.  **Absent extraordinary circumstances, no extension of these deadlines will be granted** with or without a stipulation because rulings on such designations are time-consuming and the court requires sufficient time in advance of trial to make them.

1

5. **Motions in limine**.

    a.     **MIL deadlines**.  Motions in limine (MILs) are due October 4, 2024, and responses are due 14 days later.  These court-ordered deadlines override any deadline contained in a federal or local rule and will not be extended absent extraordinary circumstances.  MIL replies will be allowed only with leave of court, and each side may file only a single request for leave, see L.R. 16-3(a).

    b.     **Additional MIL requirements**.  The process for preparing and filing motions in limine will be governed by the following additional rules and considerations:

    i.     *Meaningful meet-and-confer required*.  As Local Rule 16-3 requires, before any motion in limine is filed, the parties must meet and confer (by telephone or in person not merely by email or some other form of writing) about the substance of each contemplated in-limine issue and attempt to reach an agreement on the issue.  Evidentiary agreements reached during this process must be memorialized by a written stipulation.  If the parties do not reach an agreement on an issue and a motion in limine remains necessary, the motion must be accompanied by a declaration certifying that counsel actually conferred in good faith to resolve the issue before the motion was filed (or re-filed), see L.R. 16-3(a).  The failure to include the certificate of counsel will result in the automatic denial of the motion without the opportunity to cure this deficiency.

    ii.     *Only evidentiary issues*.  Motions in limine must address only true evidentiary issues and not be belated motions for dispositive rulings disguised as a motion in limine.

    iii.     *Omnibus filing*.  Any party desiring to file motions in limine on multiple issues or requesting multiple rulings must include all in-limine issues in a SINGLE, omnibus motion that numbers each issue consecutively; no party may file

2

multiple, separate motions.  This format eliminates the need for redundant recitations of facts and introductory statements of the law.  If the size of the omnibus motion exceeds the page limit in the local rule, see L.R. 7-3(b), a separate motion to exceed the page limits should be filed contemporaneously with the omnibus motion; the motion to exceed page limits must not be styled as an "emergency."

iv.   *Vague requests prohibited.*  The parties are cautioned that vague requests based on speculative issues, like requests to generally preclude improper attorney arguments, violations of the golden rule, or irrelevant evidence will be flatly denied.  The court intends to follow the rules of evidence and procedure at trial and expects the parties to do the same.  Motions seeking little more than an order enforcing a rule waste the court's time and the parties' resources. Counsel is strongly cautioned that abuse of the motion-in-limine vehicle in this manner may result in sanctions against the attorneys.

This order will govern the trial of this case and may not be amended except by order of the court.

DATED: May 16, 2024.

_____
JENNIFER A. DORSEY
UNITED STATES DISTRICT JUDGE